The next case is Helen Mining Company v. Director, OWCP, United States Department of Labor, and John O. Bush. Mr. Mattingly. May it please the Court, my name is William Mattingly, and I represent Helen Mining Company in this federal black lung claim. I've asked the crier to reserve five minutes for rebuttal. Granted. There are two issues that I'd like to discuss with the Court this morning during the oral argument, and let me appreciate, or give you my appreciation for allowing the parties to approach the Court orally and argue this case. The first issue is the timeliness question. The second is, why is the administrative law judge's decision not sufficient in and of itself? Let me address the timeliness question first. The statute is pretty clear in this case. 30 U.S.C. 932F says that a claim shall be filed within three years of a medical determination of total disability due to pneumoconiosis or within three years of the passage of the Act, which was in 1978. A little perspective is necessary to understand why there's two prongs. The Social Security Administration first administered the black lung program in the early 1970s. There were about tenfold more claims, or, yes, tenfold more claims than the government thought were going to be filed. Instead of 50,000 claims, there were 500,000 claims. Liability was shifted from the Social Security Administration to coal mine operators. Interim regulations were put into place, the so-called Part 727 regulations. The permanent criteria under which this claim is evaluated, the Part 718 claim, went into place in 1980. So there was a window provided. If people had had prior claims that were heard, they could refile that claim. That's what the purpose of that statute was back in 1977. The regulations interpreting the statute say it's not waivable. It's not tollable. We need to apply it. There's a whole series of circuit cases, and I do want to talk about some of those. But the first case I want to talk about is the Supreme Court case, U.S. v. Kubrick. It's not a black lung case. It's a VA veteran's case. Interestingly enough, it arose out of the Third Circuit. It's a statute of limitations case. The veteran went in. He had treatment to a leg. They used an antibiotic. He had hearing loss six months later. A physician told him, it may have been due to that antibiotic they used for your leg infection. He didn't do anything for over two years. His VA benefits were litigated. He then filed a claim under the Federal Tort Claims Act. It was more than two years after he had knowledge that he might have had this reaction to the antibiotic. The Third Circuit affirmed the district court's decision that said, no, we're not going to apply the two-year statute of limitations in that case. The Kubrick decision makes it very clear that Congress puts statutes of limitations in, and they often make what are otherwise valid claims impossible to litigate. There's a purpose for a statute of limitation. The statute of limitation allows the parties to know the case is there. It doesn't let memories go stale, and it doesn't let facts escape. That's important in this case because when you look back at the record here, this gentleman's history of smoking has changed. It was a pack and a half per day back when he told the physicians in his first claim. That's what he told some of the physicians in the second claim about 16 or 17 years later. But the administrative law judge the second time said, I don't think he smoked more than a package a day. Those facts have changed. We also have lost the opportunity to examine him through the years if he had followed the correct procedure. Why is that? I mean, this seemed to be a classic battle of the experts. Each side had two experts, right? It is not as if you were deprived of proving up your case. Well, if he had followed the correct procedure under the Longshore Act to keep that first claim alive from the 1990s, he would have had to file modification under 33 U.S.C. 922. That provision of the Longshore Act is incorporated by negative reference by the Black Long Act. The regulation that implements it is at 725.310. And that regulation mirrors what the Longshore Act says. And it says if you have a claim that's denied, you have a one-year window to say, I want a do-over. I want you to look at the facts again. I don't have to offer any evidence. Take a look at it again as an adjudicator at the administrative level and see if there wasn't a wrong decision. Isn't that antithetical to the entire purpose of the act? I mean, it doesn't take into account the fact that pneumoconiosis is latent and progressive. It may manifest itself in one instance. You could have medical disagreement about that. But at another point in time, clearly if you looked at it, it may have progressed. Shouldn't our actions in looking at it take into account that? And doesn't the view of the director and obviously the BRB take that into account? Why shouldn't we follow that? The circuits that have suggested that, and the circuits on point are probably the Fourth and the Sixth Circuits, although there's a split in the Sixth Circuit cases, have made much of the fact that pneumoconiosis may be a latent and progressive condition. The regulation says it is. Are we supposed to just ignore that? The regulations say that it may be, as the director conceded before the district court in Columbia, the D.C. Circuit Court of Appeals, progression of pneumoconiosis is a rare condition. So we don't have to make the rule. And that's one of the problems with the ALJ's decision here. He makes these large rules that are may be or could be or can be, but makes them enforced as in every case. If a retired minor has a progressive lung disease, it must be pneumoconiosis. But that would, if we followed what you're suggesting, let me make sure I understand, within a year of denial, if there were no manifestation of pneumoconiosis different in nature and effect than the earlier one, they would be forbidden from that one year past the denial on from making any claim. That would be it. That's what the statute of limitations says. And if that were so, whether we could argue about may and what the effect of may is, I think we could have an intelligent argument about that, but clearly it would forego, I'm sorry, foreclose any possibility of the latency and progressive nature of the disease and taking that into account in court, right? Yes, and, Judge, I understand your concern, and it sounds harsh. But remember, this ball was not put into process by anyone other than the claimant. They selected the physicians they went to see. If they got a physician that offered an overly compliant opinion, that really the evidence didn't support a finding of total disability due to pneumoconiosis, now that claimant, that minor, bears the burden of keeping that claim alive with requests for modification every year. This isn't an entitlement act for just years of employment in a coal mine. The act's purpose is to compensate those minors who have a chronic disease of the lungs that has caused total pulmonary disability. It's defined as you can't go back and do your work in the mines. So if I understand you correctly, if they complied, as you say, with the regulations and filed a modification, that would essentially give them their extension of time past the one-year? Yes. Past the denial. And while I'm intimately familiar with this process, you don't try these cases all the time. The process takes an awful long time. If you ask for modification before the district director, it takes anywhere from 6 months to 18 months. It takes another 6 months to an 18-month period if you ask for a hearing before the Office of Administrative Law Judges to get that hearing, another 6 to 12 months to get the decision from the judge. If you appeal to that decision to the Benefits Review Board, another 12 to 18 months. So if a minor really thinks he has a colorable claim that's justified and it's denied, they can ask for modification. And that process really takes into consideration the latency and progression of pneumoconiosis. Let's take a step back for a moment. I appreciate that edification. Why shouldn't we show deference to the director's view on the effect of the statute of limitations? Because the director's view looks only at the possibility of progression and latency of the disease and ignores the statute of limitations. The director does not want to apply the statute of limitations or subsequent claims. So what's the standard that we should apply in reviewing the director's view if we're not to exercise the appropriate deference? The director gets Chevron deference if it's a reasonable interpretation of the statute or the application of the regulations. It's my position it's not a reasonable interpretation of the statute. Congress said what they said 3 years after a medical determination of disability. The Fourth Circuit's decision in Consolidation Coal Company v. Williams, which I argued, is wrong because one of the justifications to apply or not to apply the statute of limitations in that case was because it would potentially bar meritorious claims. And as the Supreme Court stresses in Crouper, that doesn't come into the calculus of decision-making. Some valid claims may not make it through the statute of limitations. That's what they're designed to do. I'd save time for rebuttal. Thank you, Mr. Mattingly. Ms. Hart-Cox? Good morning. Helen Cox for the Director Office of Workers' Compensation Programs. Generally, the purpose of a statute of limitations is to ensure that the petitioner files a claim within a period of time that the legislator deems reasonable so that the defendant and the courts aren't stuck with dealing with stale claims. In the context of the Black Women's Benefits Act, Congress determined that it would be a 3-year period from when there was a medical determination that the minor was totally disabled due to pneumoconiosis. And the regulations clarified that to be when that medical determination of total disability due to pneumoconiosis was in fact communicated to the minor. But the statute also, the Black Women's Benefits Act, also is an all-or-nothing statute. Either the minor is found to be totally disabled due to pneumoconiosis and is entitled to benefits, or he loses. So the act allows for a minor who has filed a claim too early and been denied benefits to file a subsequent claim because his condition has changed and he is subsequently found to be totally disabled due to pneumoconiosis. So the only way that these two parts can work together where both are given effect is that where a medical determination of total disability due to pneumoconiosis, which prompts the claimant, the minor, to file his claim, and then is not found sufficient to support an award of benefits and results in a denial of benefits from the fact finder, that fact finding has to be accepted as correct once it becomes final. So that means that earlier determination from a medical professional is in fact wrong. Therefore, that medical determination which cannot be used is not legally sufficient to support a subsequent claim because it predates the determination by a fact finder that the minor is not disabled as of this point in time. It can't show that his condition has worsened. So under your theory of the statute, then, a minor could file 8 or 10 or 14 claims. Seriatim. Seriatim. The statute allows for it, but each time he files a new claim, he has to have that supported by new medical evidence establishing proving his claim or attempting to prove his claim. The old evidence, which has now been deemed wrong by that intervening denial of benefits, is not sufficient to support a claim of benefits. Benefits cannot be awarded back to that date of that medical determination because it has been deemed wrong by the fact finder. Does that mean he needs a new doctor, or could he get the same doctor to say something different? He does not need to have a new doctor, but he needs a new doctor's report based on a new examination showing that his condition, where he was found not to have pneumoconiosis or not to be disabled by that pneumoconiosis, that he now, in fact, does have pneumoconiosis and is disabled by it. Tell us why the paradigm that Mr. Mattingly sets up is wrong. I mean, if I understood him, after the first denial, the minor would have a year to gather together whatever evidence of latency or progression that's happened in that period of time, and then after that year they'd be cut off unless, if I understand him correctly, they file a timely and appropriately documented modification and then subsequent modifications until they can file their subsequent claim. Is that not the way that you see the regulations working going forward? The regulations in the statute allow for modification within one year of a decision, and that's a complete waiver of res judicata, so that everything is up for relitigation, but that is within one year of a denial of benefits. Under Mr. Mattingly's proposal, the minor would be forced to repeatedly file those requests for modifications which are based on either a mistake determination fact or a change in condition, whether or not he believes there is, in fact, a mistake or a change shown yet. Mr. Obush's case is a perfect example of why the statute of limitations should be considered to be reset. He received, in 1990, a medical determination from Dr. Turco that appeared to support his claim that he was now totally disabled due to benefits and an administrative law judge, after weighing all the evidence, found that he was not, in fact, totally disabled due to pneumoconiosis in 1991. He accepted that as a correct determination. He took no further action on that claim because he was not challenging the correctness of that decision. Then in 2005, he had a medical report from Dr. Schaff that told him that at that time, he was now totally disabled due to pneumoconiosis, and within one month he filed his claim for benefits, which is now pending before this court, which has been found to be entitled on the merits. So he was not forced to burden the system administratively by filing 10 requests for modifications to keep his claim open. Actually, it would be 15 requests for modification to keep his claim open from 1990 to 2005 when he, in fact, got a new medical report that established his entitlement to benefits, or at least gave him notice that he was now, should be considering himself, possibly entitled to benefits and having a legitimate claim to go forward to. And if we rule against you in this case, it would seem that every time a minor is denied, counsel will be suggesting to the client to automatically file these one-year renewals ad infinitum until the person passes away. Correct. And that would, for both the director and for the employers, that would create quite an administrative burden and needlessly clog the system when there are, there are minors who do feel that a decision is wrong and they have the right to file modification, but they should not be put in the position where they have to file modification when they don't, in fact, disagree with the decision, finding that they are not at this point in time totally disabled due to pneumoconiosis, and they're willing to accept that as correct as long as they have the opportunity down the line when their condition has deteriorated to filing new claim for benefits. And that new claim for benefits is truly based on a change in condition. A minor cannot be awarded benefits prior to the date of the earlier denial of benefits. That is a set time where he cannot be disabled due to pneumoconiosis prior to that date. So it's got to be based on new medical evidence and a showing of a change in condition. And here the evidence, as the ALJ found, establishes, clearly established that, and substantial evidence supports that finding. If there are no further questions, thank you. Thank you, Ms. Cox. A rebuttal, Mr. Mattingly? Yes, let me just briefly note, in the Tenth Circuit cases of Brandolino and Oliver, as well as the Sixth Circuit case of Sharondale, the director cited those for support of their argument. They don't apply in this situation. All three of those cases, the individual minor went back to work in the mines, and that clearly resets the timeline of this clock because with more exposure you can develop disease. That seems just to make sense. Those cases really don't help. All right, but let's go back to the statutory language for a minute. It's my sense, Mr. Mattingly, that you're asking us to read the statute to say that the three years begins to run from the first medical diagnosis. But it uses the word a instead of the first. If it said the first, you've got a slam dunk, right? It would be easier for my kids. You didn't admit that. But the word a, it seems, speaking only for myself, seems to connote one of perhaps many. How do you get us to read a to mean the first and only? You can't read a the way the director is suggesting, which means it's a medical diagnosis unless a legal determination means that it's not correct. So in the context of the statute, I don't think there's any interpretation that's possible because it's a statute of limitation. It talks about when you discover. And the language of the statute was changed. It used to be a discovery of total disability due to pneumoconiosis. That could incorporate legal decisions, but it was changed by Congress to a medical determination of total disability due to pneumoconiosis. And he got one. He got a medical determination 15 years later. That is correct. So why, just reading the plain language of the statute, why doesn't the three-year clock begin to tick whenever he gets a new determination? I think the three-year clock does begin the first time he has that first medical determination. That's the only way that you can apply the statute of limitation and have it make sense. Section 922 gives him the option, if he's brought the claim too early, to attempt to continue to litigate it. Once again, the responsibility is on the minor to only bring meritorious claims. But he doesn't know. He's not clairvoyant. He thinks he's got one, but he doesn't. And why should we put this claimant, who waited 15 years or so, in a worse position than the claimant who loses and is super disgruntled and just files one-year extensions seriatim? That doesn't seem to make much sense, does it? That's what the statute says to do. It says once you have a medical determination of pneumoconiosis, you have to file a claim or you lose the right to file a claim. And it says explicitly that that's your only avenue of relief if you lose your claim. Yes. It's a one-shot deal. Can you quote that language? I do. Of course. And it says within three years of a medical determination of total disability due to pneumoconiosis. No. I thought the language to which you were referring is the regulatory language that says that your only option if you lose your claim is to file the one-year extension. When you look at Section 725.310, that is the option that's given to you under the Longshore Act at Section 33 U.C. 922. All right. I know that's an option. Does it say that it's the exclusive option? No. And that's the other problem. The statute doesn't say anything about filing subsequent claims. It doesn't envision the possibility that coal miners would go out and do what's happened in the system and file numerous claims. Well, if that were so and that were the intent of the drafters, then what would be the purpose of recognizing the latency and progressive nature of the disease? I mean, there would be no purpose to it, right? Because whatever you thought that you had initially, you gathered the medical evidence. The medical evidence would either support it or not. If it did, you've got three years and that would be it. If you need, nothing further. The statute says nothing about latent and progressive. Latent and progressive was added in through court decisions and through the regulatory definition, and it's just a possibility. Physicians can't rule out that a coal miner who is disabled and has lung disease does not have pneumoconiosis because it was latent and progressive. Right, but we obviously have to read the regulations. I mean, put aside for the moment, just for the sake of argument, the court cases. But the regulations and the statutes have to be read together. Yes, and the director's interpretation of that regulation, as they announced in the NMA case from the D.C. Court of Appeals, was it's a rare condition. If I may make one final comment, you had a concern about what do you do with a new doctor with a misdiagnosis. I had the same concern because if we have to give full faith and credit to that prior decision and that medical opinion is a misdiagnosis and they come in with another letter from that doctor, I think it has to be thrown out because the doctor was judged to have misdiagnosed before. We have to give full faith and credit to that decision. His second chance, without any new evidence, has to be a misdiagnosis also. And that's the convoluted logic that we get here. Well, just because he's wrong the first time doesn't mean he's wrong the second time. But we hear your point. Thank you, Mr. Madden. Thank you. Again, I commend counsel for the excellent briefing and argument. And as with the first case, we'll take that case under advisement.